Our second and last case of this morning, number 18-2462, Verma, versus 3001Castor, Inc, et al., Mr. Rinelli and Mr. Essel. Take your time setting up.  Good morning. May it please the Court, I'm John F. Rinelli here on behalf of the defending appellant, 3001Castor, Inc. And I'm going to ask for five minutes rebuttal time. That's fine. Thank you. I'd like to address first and foremost the procedural issue that was raised by the appellee. They have taken issue with whether the filing of a motion for summary judgment and... I'd like to talk about the settlement first, actually. The settlement first? Yes. So I'm not clear as to, you know, you allude to a settlement. I see no Rule 41 that is a result of the settlement. And is that sort of a nullity? Or is it something we should just, you said your piece and we move on? I put it into the record because I think it's important for it to be before the Court.  Well, the parties agreed on a number of $109,000 for the 22 individuals who opted in to the case. Our perspective, our view was that that is for a settlement of the FSLA claim. And I think as our papers demonstrate, we don't believe that there's any basis for having a Rule 22 class. Nothing was reduced to writing, I presume? And nothing was put on the record before Judge Brody? There was a document that was drafted. The transcript seems pretty clear. What's the deal? What's the deal? And there's... Nothing was signed off on. Our view was 109 is for those 22 individuals. That closes the book on those 22 individuals. They are not going to get... And to be consistent with the position we've taken... That's an interesting analogy, closing the book on this. But... We're not going to allow those individuals have a double recovery. That was our terms. Those were our terms. $109,000 to the 22 individuals under the FLSA. Period. All right. So... You would concede then that there's no way to enforce that settlement since there's no order anywhere... And there's no agreement anywhere... And that for our purposes, there's nothing before us and we have to move on. We, as a court, have to move on. Yes. You agree with that? Yes. All right. Yes. Based upon where we were at the point in time when the briefing was taking place, it's something that I thought was important to place on the record in the proceedings here. On the jurisdictional issue, don't we review CAFA jurisdiction based on the pleadings? I'm sorry, Your Honor. Don't we review whether there's CAFA jurisdiction based on the pleadings? My hearing is bad. I missed one... Don't we review CAFA jurisdiction based on the pleadings? Yes. Okay. Now, you said the district court abused its discretion in exercising supplemental jurisdiction, but did you really want Judge Brody to dismiss the action a week before trial after all the work she and the litigants had done to prepare for trial? I think that all the work that was done was a function of the schedule. Our position all along was that we did not believe that the state claim was a valid one. And that was raised with the court. The court made its decision back in June of 2014, I believe, and the case was dormant from 2014 all the way up until we had a trial date. Okay. So we moved, filed a motion for assembly judgment. That was denied. We think that in terms of... How do we get to the substance of that substantively? Here's the problem that I'd like you to help me work through. Now, your notice of appeal focuses on your post-verdict motion. Correct. It's not a general notice of appeal where you're just appealing the final judgment. As a consequence, Judge Brody had to deal with the individual motions in your post-verdict motion. And my understanding is because your notice of appeal is fashioned that way, we're bound as well. So what I mean specifically is Judge Brody termed your motion, as it related to the issue of summary judgment on employee versus independent contractor, as a motion for reconsideration. And she ruled that you were out of time and did not have a substantive discussion on her prior ruling. Now, because of her equipping it as a motion for reconsideration and her determination that it was untimely, and the way you fashioned your notice to appeal, it appears to me, I don't speak for my colleagues, it appears to me that the only thing that we can review substantively is her disposition of the motion for reconsideration. So what that means, as far as I can see, and I'd like you to help me if I'm wrong, is we can review her determination of whether it was timely or not. And if we agree that it's untimely, I don't know how we could get to the substance of your argument. Well, I don't agree with Judge Brody's characterization. What we did is we filed our motion for summary judgment. She denied that because the case went forward. It was interlocutory. The motion was interlocutory and preserved for appellate review. Her characterization is her characterization. We didn't ask for reconsideration. She decided that she was going to take our interlocutory motion, which, you know. How would you cast a post-verdict motion made after a jury trial? Well, this is an FLSA case. The judge was the determinator of the merits of the case. She made the decision that this was not independent contractors, but rather employees. The only issue that there was at trial was the amount of damages. Right. But after the trial, you wanted her to look at that issue again. How else would you equip that but a motion for reconsideration? Well, she makes it a motion for reconsideration. But you're after trial. You tell me what it is. I'm totally willing to go with you. One second. It's very hard for the recording device, right? Just one second. Yep. How else would you equip this other than a motion for reconsideration if you want her to look at the summary judgment determination that she made prior to trial? Now we're after trial. You style your motion as a post-verdict motion. How else is she to consider this? Help me with that. What else could it be but a motion for reconsideration? It is a renewal of the motion that we initially filed in which she dismissed. The way she handled it is what she said. I have it in front of me. Would you like me to read it to you? I'm more than happy to listen to it. Take a moment, please. I'm making reference to her opinion of June 30, 2014, footnote one. In the appendix, it's page 554A. And she says, Verma moves to strike the affidavit of Joan Lenihan and the supporting appendices on the grounds that they constitute an impermissible submission of expert testimony that were not previously disclosed in accordance with the Federal Rules of Civil Procedure 26A2. Just a pause. Joan Lenihan was not an expert. She was a – Right, but that's not the source of your post-verdict motion. Your post-verdict motion on page four of your motion says, the court improperly refused to grant summary judgment on independent contractor status. In the judge's order, she says that the only thing – the only way she can characterize your motion is to reconsider. And she cites the local rules. All I can say is that what she did was take the facts, while I – again, from her June 30, 2014, opinion, while I acknowledge several facts from an affidavit and factual background section, the defendant has failed to demonstrate the relevance of the opinion testimony in the Lenihan affidavit, I will not consider this testimony for purposes of deciding the motion for summary judgment. Therefore, I will deny the motion to strike as moved. Then she took all of the facts which were in that motion that she struck as denied and went ahead and put it in her June 30, 2014, opinion. The facts are undisputed. There's no factual dispute. On the basis of the facts that are in the June 30, 2014, opinion, what we have is facts sufficient to establish whether the individuals, the dancers, are employees or independent contractors. And we have all along, in everything that we have filed with the court, taken the same exact standard used by Judge Bailson in the Uber case, most recently before this court. The courts identifying this as a motion for reconsideration is addressed in our motion, post-verdict motion. And we go into the detail there. That record was preserved. It was... It was interlocutory. I think there's an argument that could help you here. And that is, there's a case we have in 2017 called Traska v. L'Oreal that says that you have appellate jurisdiction over orders that weren't specified in the notice of appeal if, one, there's a connection between the specified and unspecified orders, two, the intention to appeal the unspecified order is apparent, and three, the opposing party is not prejudiced and has a full opportunity to brief the issues. And one could make an argument that they have fully briefed the issues, so... That would be applicable here. My question on the merits here is, it looks like Judge Brody did a very thorough job of saying that these were employees. And what's the argument that somehow these are not employees but rather independent contractors? I think that what demonstrates and makes all the difference in the world as to whether they are employees as opposed to independent contractors is the evidence in the record of the time patterns that the dancers are at different venues. The dancers move fluidly throughout the industry. Some work seasonally, some work... But other than choosing their shifts and agreeing to or rejecting requests for private dances, what control did they have over the performance of their work? Like there was a lot of control exercised by the manager. Well, it's a difference in the nature of the control. Where there was no control, it's for the independent dancers being performed by the dancers for patrons. Where there is control, as set out in the record by the plaintiff, has to do with conduct on the floor. As I think the evidentiary record establishes, it's under 10 minutes an hour that the dancers on average are on the floor of the premises. The rest of the time they're socializing, meeting patrons. Many instances there are patrons who follow particular dancers and they go for private dances. Those private dances earned $20 for a four-minute time. And the reason that it's a $20 for four minutes is in order to go ahead and provide that there is safety and security for the dancers. And the dancers really go ahead and generate their income. But it looks as if the only real element you might have in your favor is that they're not permanent, but they can still be part-time employees. So they're certainly integral to the business. The investments are done by your client. They don't have any managerial skills that are used here, the dancers. So it really seems like Judge Brody got it right. The one thing you got going for you is that they could choose their shifts and they could agree or not agree to private dances. It is an industry where safety is paramount when on the premises. So if the dancers choose to come in to 3001 Cast Rank, there are certain rules that have to be abided by for safety of patrons and the dancers. The dancers, four-minute dancing on the stage or ten minutes for every given hour, leaves them to be independent for close to 90% of the time. And they have those private dances. They move from one location to another. In the appendix that we have here, you can look at the initial motion for summary judgment. And it has in there, at page stamp 498 through about 515, the Internet, the publication that the dancers put out. And it's very, very secure. They run it. They exchange information. Some of the topics are what are the best cities in the U.S. for experienced dancers. This has nothing to do with any management. This is what the dancers themselves provide and look into. Well, but without the plaintiffs here, you wouldn't have a business, right? That's correct. And the investment into the business is put by your client. The control over how the plaintiffs act is by the client. They're obviously, as you just said, integral to the business. There's no managerial skills that they are being asked to perform to make profit and loss. They have to conform to a schedule. No, actually. The schedule is set up. They don't have to come. Well, the premises has schedules, certain slots. Exactly. They have limited ability to enforce individuals, dancers, to appear on the date when they say they want to appear. I understand that. If that is not to the dancers' desires for the day. All right. Well, we're here for Mr. Esselstyn. We'll get you back to me. Okay. Good afternoon. May it please the court. I'm James Sinetzel. I'm here on behalf of the appellee. So the first issue I'd like to address is our argument on waiver is not so much about the contents of the notice of appeal, but the failure to make any motions under Rule 50 during the trial. So when Judge Brody was reviewing the Rule 50B motion as it was titled, the post-judgment motion, it wasn't really a Rule 50B motion because it wasn't a renewal of a Rule 50A motion. So most of the trial was conducted with almost no objections and no motions for judgment from the defendant, the appellant here. So that's where our waiver argument comes in. So isn't what the judge essentially did was equivalent to a grant of partial summary judgment in your favor? So I would say that's close. She doesn't actually – the order did not actually say summary judgment was granted. I agree. That's why I said equivalent. Right. It resolved a question of law, but I don't think that was necessarily a permanent – you know, it wasn't judgment. They could have moved – But it would seem that that merged with the final judgment. You could argue it did, but we had a trial where there was an opportunity to put into dispute. If the appellant, the defendant, believed that the record had been developed and Judge Brody got some of the facts incorrect, there was an opportunity to put those questions to the jury, and the appellant didn't take that opportunity. The appellant let this proceed as primarily a damages trial with no objection, and there was an instruction presented. On the merits, you think you have a strong argument anyway, do you not? Absolutely. Why don't we go there then? Sure, sure. We can talk about the merits, and I would direct the court to page 550 of the appendix. This is an undisputed document. It was a rule sheet. There's two pages. It continues to 551. This is as close as it gets to a smoking gun in a misclassification case involving an independent contractor of defense. At the bottom of 550, there's a heading scheduling policy. There's a required four-day minimum. There are only selected slots the dancers can choose to work, so that it's not like a contractor who can decide what time of day to show up. There's very limited windows that are set by the club. There's prices attached. The workers have to actually pay to be there, which was the basis for our unjust enrichment claim. But there's a lot of evidence of control just on these two pages, not to mention the deposition testimony that came not only from our plaintiff, but also from the defendant's manager, Mr. Silva. How do you respond to the club's argument that the plaintiffs could work for many different clubs on different days in the same week? I think Judge Brody actually did give them some credit on that factor, the permanence of the working relationship. She actually said it may cut in their favor, but most courts that have dealt with this fact pattern said that's not really a dispositive issue. You could be a bartender working at four different bars during the week, but you're an employee of each one of them. That's a pretty similar thing here. Plus, as I've already mentioned, the management of the club actually tried as hard as it could to keep the dancers there longer and make the relationship more permanent. So there was some flexibility. That factor might cut in favor of them a little bit, but then we have five more factors, and it's lopsided. The Fourth Circuit addressed almost an identical factual case, and right down the line, their analysis is the same as Judge Brody's. The control is evident. I've already mentioned that. Opportunity for profit and loss, those factors primarily controlled by the club. The club set the prices of the dances, not the dancers, and I'm not sure how many independent contractors there are in the world who don't have some ability to set their own prices. What if the plaintiffs, a number of them do, have personal customers who follow them from club to club? They have their own particular business as opposed to being an employee of... Yeah, that's a factual assertion that I see the appellant making in its briefing, and there were allusions to this below. I don't think that was actually an established fact, and I think the testimony presented by not only Ms. Verma but several other dancers who appeared at trial was most of them, they don't have a very developed following. They show up to the club to do work, and whoever is there is there. They don't have followers. Some do, maybe a handful do, but the record that was developed here didn't really show that that was the norm. That would be an exception. And even then, I don't think that would be a dispositive factor. We're talking about one place of business where the dancers come to work. Once they're there, almost everything that happens is dictated by management. Yes, the dancers may go out and hustle to try to get these private dance sales, but that's not much different than a waiter or waitress trying to get more tables by moving quickly and maybe pressuring the front door person to direct them some customers. It's not enough to move the needle in the other direction. What happens to other persons who perform at these venues? I'm talking about bands or singers or other performers. Yes, so typically they would have a contract where they would be paid a fixed amount for one performance, and then they're gone. It's factual dissimilarity. There are some entertainers who perform at these types of clubs, and again, this is a small number, but most of them perform in the adult movie industry, and then they'll go on tour to these clubs. And they usually have a guaranteed payment. They get there, they do one or two shifts, and then they leave. The dancers that this class represented are mostly local workers who are mostly working there multiple days a week, some of them for many years at a time. So the typical type of entertainer that we think of like a musician or a comedian, very different situation here. And again, there's a lot of control over what the dancers did once they were there. The rule sheet I've already referred to several times. On 551, there's a list of all these fines that were imposed for things like being 30 seconds late to the stage. Jerry Seinfeld doesn't get fined for being 30 seconds late to his set. So that's a big distinction between a real independent contractor and the workers here. If I may, I did want to clarify a couple things on the settlement. There's a little bit of confusion because a dispute emerged sort of after the trial. There's nothing in the record. There's nothing presented in the appendix. The trial transcripts are now available in the district court record. They were not at the time the appellant filed its brief. But our position was we were trying to solve a minor difference between the opt-in plaintiffs and the rest of the class, the Rule 23 state law class. They had the same underlying claim. For an hour minimum wage, $7.25 was their damages, $7.25. So they had that in common. The difference is the FLSA has a 100% liquidated damages provision. So if you recover $7.25 for an hour worked, you'll get another $7.25. In Pennsylvania, the max you could get is 25%. So there was a minor conflict there. We wanted to resolve that conflict through the settlement, provide the opt-ins compensation for their liquidated damages that were stronger, more valuable, and then try their underlying wage claim together with the Rule 23 class. That's exactly what we did. We were clear about our approach from start to finish. We knew these 22 individuals had parallel claims. We were not trying to get $7.25 under the federal law and $7.25 under the Pennsylvania law. Absolutely did not happen. The agreement, when you do, if you do get into the trial transcripts, every time this matter is discussed, we say it's liquidated damages. On several occasions, Judge Brody turned to Mr. Anelli and he said, is that your understanding? And he said, yes. So that's it. There's no double recovery. The problems that emerge with the settlement aren't really relevant to this appeal, but they have no effect on the amount of the judgment. Any other questions? No further questions. Okay. Thank you. Thank you. Mr. Anelli? In the evidentiary record, I can't, because I don't have the transcripts with me. In the evidentiary record, it shows that the famed entertainer scheduling house keys is the yoke around the neck of all of the dancers. That's not the case at all. The club, in order to be busy and stay busy, made every effort to bring in dancers. The dancers exercised their own discretion. If they did not want to be there, they left. We have submitted to the court the analysis that was done that shows the number of dancers, what dates, how frequently, and you can track and see that there are individuals who have patterns. It is not a situation where the dancers are brought in and have a great deal of pressure and brought to bear on them to pay all sorts of fines. The testimony given by Mr. Brandon says very clearly the reason for putting out these penalties, the fines, was to try and get more of the women to actually come in and come in on a timely basis. What they collected in the way of fines was not a major source of revenue for the club. It's alcohol. The more dancers that are present, the larger the volume of patrons, because they'll stay longer and they'll drink more. The women routinely, particularly now with cell phones, would send out friends to different venues to see where there were larger crowds. This is not really an onerous situation. They are business people and many of them have done very well. $1,600 in a night. But it could mean they're just employees of various places. Excuse me? It could mean that they're employed at various places. They could be going to several different clubs, yes. As employees, however. Well... $1,600 is theoretical. Is there anything to recommend anybody make $1,600? I don't look at the books, but I don't think it's theoretical. If you look at what the rates are, it adds up quickly. There's $300, $400 dance studios on the premises. We believe that it has from time immemorial been independent contractors. The creation of dancers in the United States now as being employees started with a lawsuit, a class action lawsuit, in New York about 15 years ago. So there's a long history that existed. Excuse me? It's not in front of us, but the argument is that finally some people are fighting back. I mean, it's... The perception is by some that the playing field is tilted and they're trying to get back to an even playing field. So that's why these suits are brought, but we have to decide them based on the legal pencils that are before us. And Judge Brody seems to have done a very thorough job. She is very thorough. I've had many cases before her. But I do think that the evidentiary record and the standards under the FLSA are such that the dancers are independent contractors in this situation. Thank you. Thank you to both counsel for being with us. We'll take the matter under advisement.